Good morning, everyone. This morning, we are all part of something that has not been done before, so you're here on a historic occasion. We're doing a video transmission, and I'm just hoping that it doesn't make things any harder for the lawyers. You pretend that I am there, because I really am. Before we begin, I would very much appreciate if we all took a moment of silence to remember Judge Richard Cudahy, whom we lost this week. He was a man who, as Chief Judge Diane Wood noted, we will never see the likes of again. A remarkable, brilliant, kind, and honorable jurist. So, if we might just take one moment, I would very much appreciate that. I want to thank Judges Mannion and Hamilton for being there. I want to also explain that there will be a second or two delay, so I'm very hopeful that I won't be stepping over the lawyers' comments and my two brothers' comments. And you will let me know if I am. So, I'm going to call the very first case today. And it is numbers 143723 and number 151187, Contemporary Cars, Inc. and Auto Nation, Inc., And I believe that is you, Mr. Bernstein, is it not? Come on up. Good morning, Mr. Bernstein. Good morning, Your Honor. You look great. Well, I guess the camera must be a little blurry on your end then. Not at all. May it please the Court. My name is Stephen Bernstein. I represent the petitioner's cross-respondents in this case. This petition seeks to overturn several findings in Judge Carson's 2011 decision as affirmed by the NLRB. Judge Carson actually found in favor of the employer in the majority of complaint allegations brought by the NLRB, but of those that went against the dealership, my plan here is to concentrate on two in particular, as it's our contention that they're not based on substantial supporting evidence, and because the resulting legal conclusions have no reasonable basis in law. Those two issues in particular are the finding of discrimination in connection with the layoff of an employee named Anthony Roberts in the fall of 2008, and the finding of a refusal to bargain with a resulting back pay and reinstatement remedy with respect to layoffs that were implemented in the spring of 2009. Our primary bone of contention lies with Judge Carson's decision to impose a retroactive bargaining obligation, along with reinstatement and back pay in connection with the layoff of those four technicians, which it's our contention were caused by an economic downturn the likes of which the retail automotive industry had never seen. Judge Carson acknowledged that the economic circumstances confronting this business were dire and real, which suggests that no amount of dialogue with the union would have changed the fact that four service technicians needed to go on layoff if the remaining 29 were to have enough work to survive. Mr. Bernstein, if there had been bargaining on that layoff in April of 2009, would the subject have been limited to simply whether they were kept or not? And if so, which folks would be laid off? Or would you have expected as an experienced labor lawyer also that there might be bargaining on such things as recall rights, protecting seniority, and other sorts of provisions that could help these folks who were laid off in tough economic times? It's an interesting question, Your Honor, because if we were to transport ourselves back in time to that period between the date of the election and the date on which the NLRB conferred an initial certification, my understanding is that the obligation of the employer would be limited to a duty to bargain over the effects of the decision at that time rather than the decision itself. And that derives from the Seventh Circuit's decision in Sunstrand, which focused on the effects-based bargaining obligations of the parties. So my understanding is had the union requested bargaining in response to notice, then the parties would have been focused upon the impact that those layoffs would have on the four involved. So what's the answer to my question? The answer there would be effects only, but not the decision. All the effects being things like severance pay, for example. Exactly, severance pay, recall rights, seniority, continuing benefits, and that sort of thing, right? Yes, sir. So even if the economic circumstances would have required the company to lay these folks off, in the spring of 2009, bargaining could actually, if it had happened, might reasonably be hoped to generate some significant benefits for those gentlemen. It's certainly within the realm of possibility, yes. Thank you. You know, given that the technicians were paid only for work completed as opposed to hourly work, how could there be such an economic urgency for the layoffs so as to exclude mandatory bargaining? Your Honor, from my client's position, they were contending with an economic catastrophe that witnesses who testified described as an entire collapse of its service department. Certainly, my opponent has pointed out that that collapse had its genesis in circumstances that occurred months before. But the facts show that my client, over that period of time, was making its best good-faith efforts to avoid the possibility of a layoff, and upon the turn of the new year in 2009 received financial evidence indicating that the performance of the service department showed no signs of improving, which actually required it to implement layoffs across all departments, not just the service department. But it's our contention that by April of 2009, we essentially had little choice but to move forward. And I think it's fair to point out that at that particular point in time, the dealership was already in the very early stages of contesting the certification that was initially imposed, essentially arguing that the bargaining unit determination was improper. And as the NLRB has pointed out, that was a determination that has since been made by the 11th Circuit. But where the economic hardship, as you noted, has accrued over months or possibly years, why should that be a basis for avoiding mandatory bargaining? Well, I guess I would answer that in two ways, Your Honor. Circumstances have since indicated that the certification that the NLRB issued was issued by an unauthorized NLRB, an agency that was operating without authority to act pursuant to the Supreme Court's decision in New Process Steel. It's also our contention that operating without authority, the NLRB essentially committed an ultra varies act in the form of dictating that the ballots in this case be opened, counted, and but for that action, we submit that my client would never have been operating with constructive notice as to the authorized representative status of the union. At the time this happened, however, you had ballots opened, counted, the union had won, you wanted to contest that, and so that's at your peril, right, your decision to contest that and to refuse to bargain on such matters until the controversy was resolved. Now, the controversy took a little extra time because of the issues over the composition of the board and the New Process Steel case and so on, but it's not that, I don't see anything that's all that different from an ordinary election contest here. Your Honor, we would suggest that there were some circumstances here that were extremely unique, two in particular. The compelling economic circumstances that have been described and are in the record were highly unique, very distinguishable from some of the cases that have been pointed out by my opponent. That doesn't really address the issue of the election contest, though. Well, it does in this respect, Your Honor. The O'Connor standard, which is the at-your-peril standard I believe you're referring to, creates a safe harbor for compelling economic circumstances. One of our contentions is that we qualified for that safe harbor by virtue of the economic circumstances. Right, and the ALJ found otherwise, right? He did indeed, yes, Your Honor. What I was trying to focus on is your New Process Steel argument, which seems to be an effort to basically create a new exception to the at-your-peril doctrine. Yes. These were fairly unprecedented circumstances. It's our contention that this was not a situation where an employer was simply trying to avoid bargaining during the pendency of a certification. In this particular case, you had circumstances in which the NLRB itself was deemed to be operating without authority, and it was only the NLRB that could have ordered this particular region to open those ballots and thereupon count them. I think some of the confusion may lie in the fact we're really dealing with two periods of time. We're dealing with the period of time between the election and the initial certification, which memory serves issued at some point in February of 2009, and we're also dealing with a second certification that was issued by the NLRB in August of 2010. As we pointed out in our briefs, that decision contains a footnote for making very clear that for future purposes this certification shall be deemed effective as of August 23rd of 2010. It's our contention that until the certification issued, our clients were not operating under any duty to bargain over the decision itself. I understand that's your contention, but I thought the law was pretty well established that the duty to bargain is triggered by the election results. The duty to bargain is triggered by the election results, assuming that the results were properly conducted and the ballots properly opened by an authorized board. It's our view that... Where does all that come from? Well, you will have to read it into the fact that there's no provision in the Act for bargaining during the pendency of ballots that remain impounded. We're not aware of a single case that imposes upon the parties a duty to bargain while those ballots remain impounded. It seems clear to us that those ballots should have remained impounded until such time as a duly authorized board instructed that they be opened. I have a question. You know... Oh, sorry. I have a question regarding layoffs. There was a... Before the time, there were... I forget the names of various people, but you gave a directive to the three separate units that they're each going to have to consider laying off two people in each one. This was preliminary to all of this. My question related to that is they only... But that would have been a total of six. There were only four that were laid off. Were they, those names, the ones that emerged from that requirement to come up with names? Yes, Your Honor. I think you're referring to the teams as they were described in the service department, and you're correct that initially the directive was for each of the three teams to select two individuals from each team for layoffs. I believe the record will show that at some point that directive changed, and it changed in part because one of the witnesses testified that, in his view, it would be arbitrary and unfair to approach this from the standpoint of teams, and instead they were directed at that point simply to pick the bottom six. Now, the record is a little unclear, as I understand it, as to how the dealership went from the number six to the number four. We can make presumptions, but I don't think there's much testimony in the record on that point. The individuals... This was a year later than Robert's being laid off, right? Yes. To be fair, I think seven months. Yes, sir. All right. Well, the other... You know, I'd like to... I just wanted to finish, if I may, just one more question here just to follow up on that. As far as those names of the four, were part of it emerged from that issue? I mean, from that directive, the bottom four, bottom six, and also from the standpoint of other workers. Because you operate on a book time, and the downturn, there were a lot of people who would be sitting idle, and the objective, as I understand it, was to funnel the work into those remaining, and others would be out other than possibly losing those people who were higher up. That's correct, Your Honor. One unique aspect of this case is the form of compensation under which these technicians were operating, which is typically deemed flat rate pay, through which they're only paid for the hours they actually turn, so to speak, when they repair vehicles. And in this particular case, there's evidence in the record to suggest that as business was slowing down, between 2008 and then again into 2009, there were concerns that technicians would leave the dealership of their own accord, because essentially they didn't have enough work to sustain them. And that was one of the driving decisions to continue with the layoff process into 2009. Thank you. My problem here, and I hope you can help me with it, is that many of the arguments appear to seek a reweighing of the evidence, or a reconsideration of credibility determinations. But under our standard of review, those arguments are somewhat misplaced, at least, where the record provides some support for the determinations. So, I mean, we have to consider only whether a decision, as here, is supported by substantial evidence, and whether the legal conclusions have a reasonable basis in law. And, of course, I know that you fully comprehend that the Court will not interfere with the Board's choice between two permissible views of the evidence. So help me with that. What is impermissible? Certainly, Your Honor. And I'll concede that with regard to one of the layoffs at issue, that of Mr. Roberts in October, I'm sorry, the fall of 2008, credibility is an issue. And we're well aware of the difficult standard we're up against in overturning a credibility determination. Before I address that, I would say, however, that with regard to the four individuals who were laid off in the spring of 2009, it's not necessarily credibility that we're attacking. In fact, it's our argument that there really is no disputing the notion that had the parties engaged in bargaining, as Judge Carson has directed, it's wholly improbable that any other outcome aside from this one would have emerged. Now, to His Honor's point, perhaps effects in the form of severance could have been negotiated. But the judge himself made abundantly clear that the layoff selection process was free of any discriminatory motive or intent. So it's our position under the guidance that Sunstrand has given us in this circuit that the remedy piece of this, which, again, goes to reinstatement, but also back pay stretching back seven years, would be wholly inappropriate. And this Court and Sunstrand, in reaching that determination, seems to be making two determinations. First, the equitable one, that it simply would be inequitable to impose what comes across almost as a double penalty from the standpoint that you're forcing an employer to go back and pay four people, knowing that, looking back in time, four others would have been laid off regardless, and that the process itself is not in question. Now, to be fair, with regard to Mr. Roberts, it's true that we take issue with Judge Carson's credibility determinations. But there I would simply point out that a close reading of that decision, through the judge's own admission, acknowledges that the witness on which he penned almost all of his findings, when Mr. Weiss was profoundly and completely discredited in all other respects, and there is case law suggesting that in those circumstances where the judge's credibility determinations are, for lack of a better word, illogical, they are open to scrutiny and, in fact, can be overturned, and we submit that this is one illogical decision to the extent that How can we say that when you have Mr. Roberts with a B plus skill rating, which was higher than nine other employees, including employees with D ratings, who were not chosen to be laid off, his documented productivity was higher than 19 of the technicians, and he had seniority over 14 employees. I mean, I understand that his latest evaluation identified the fact that he did not have, let us say, the best mastery of the diagnostic skills. But all in all, when a trier of fact looks at all of this, it looks like he was not laid off based on his inferior skills, but rather that another motive may have played a role. Your Honor, my response to that would be that our client proffered a legitimate, non-discriminatory reason for the selection in the form of Mr. Roberts' computer skills, as opposed to the skill reviews, which there was evidence were not a primary motivating factor in the determination, along with his productivity. It was his skill set my client focused upon, and there is case law suggesting that it is not proper for the agency to substitute its own business judgment for that of the employer, where such a reason is proffered. Now, certainly my opponent has argued that those proffered reasons were pretextual, but I would submit that evidence in the record itself suggests that Mr. Roberts, by his own admission, went out of his way to conceal his union sentiments, that in fact two other individuals were selected for layoff at precisely the same time, also technicians, neither of which is the basis of an unfair labor practice complaint, and that in fact the evidence that was adduced suggested that at that particular time, the service department was operating in a state of utter collapse. With regard to Mr. Roberts, just that one issue about who made that determination about his, I don't know whether his diagnostic skills or some other technology skills, that he was at the bottom rung on that. What's the evidence of that? General Manager Berryhill testified that he was ill-equipped to make that determination on his own, and for that reason relied upon the judgment of certain team leaders, one he referred to as Bruce Macon, another, Mr. Aviles, who actually testified at the hearing and corroborated Mr. Berryhill's account that Mr. Roberts had deficient computer skills. He did testify. I understand maybe neither of those testified. Mr. Aviles did, sir, yes. Mr. Macon did not. Didn't Mr. Aviles contradict Mr. Berryhill's account in some important ways, particularly with respect to his knowledge of Roberts' union sympathies? Your Honor, that is correct. Mr. Aviles suggested, if memory serves, that Mr. Berryhill may have been aware of Mr. Roberts' union activity at that point in time. Which Berryhill had denied, right? He did indeed. Denied knowing about that, having learned about that in the presence of Mr. Roberts, was that right? The carefully worded question that amused the ALJ so much? Your Honor, I apologize, but my recollection is that much of the judge's findings turned upon the testimony of Mr. Weiss. Is it not correct, though, that Berryhill was asked a carefully worded question, not about whether he had any knowledge of Roberts' union sympathies at the time, but whether he had seen them exhibited in his presence? Yeah, that question presumably was proposed by me on direct exam, and I do recall that that is how it was characterized. And while we're arguing the facts about the Roberts decision, we've also got all of the other 881 violations leading up to the election. We've got the timing eight days before the election, as well as Weiss' testimony, right? And if Weiss is to be believed, then Berryhill is not being candid with the Court. That is one interpretation, Your Honor, although I would submit that Judge Carson didn't necessarily discredit Mr. Berryhill on that point. You have used your rebuttal time, but everyone has to keep an eye on that yellow light. But I will give you a minute for rebuttal. I appreciate that, Your Honor. Yeah, thank you so much, Mr. Bernstein. Good morning, Mr. Laurel. Good morning, Your Honor. May it please the Court. I hope you will speak right into that microphone so that I can hear every word. I will. Can you hear me? I can hear you. I can see you. And you, too, look great. Well, thank you very much. I'm having a nice visit so far. That can change on a dime in this courtroom. But, Your Honors, may it please the Court, I am Greg Lauro for the National Labor Relations Board, seeking full enforcement of the Board's order. Because, as you were discussing this morning, the challenges to the order fall into two categories. One is the view that the Board's fact-based findings weren't supported by substantial evidence, whereas, as we explained in our brief, the Board's view of the evidence and its factual findings are permissible. And the other category that you were discussing this morning is this claim that the company had no duty to bargain at the time of the unilateral layoffs and other changes, when actually the company's duty to bargain is triggered by the election in late 2008. And the company's claim otherwise, the company's claim for an exception to that well-settled at-parallel doctrine, fails for three basic reasons. One is they didn't make that claim to the Board when they had a duty to set forth all their claims or procedural irregularities in the underlying election. Two, whatever claims they preserved or didn't preserve for judicial review were resolved by the 11th Circuit. And that's something I don't know if we mentioned very much this morning, that that 11th Circuit decision was meant to resolve all potential challenges and any irregularities in the underlying representation proceeding. And then third, and perhaps most importantly, under the at-parallel doctrine, it just doesn't matter. Had the votes been impounded until the three-member board issued a certification order in 2010, then under the at-parallel doctrine, the duty to bargain would have still related back, still been triggered by the election in 2008. So the result would be the same. How would you determine how significant an economic crisis must be in order for an employer to act without first resorting to bargaining? Well, Your Honor, the Board would look at facts, including the ones mentioned in the case law, as to whether this is an unforeseen circumstance or one that requires immediate action. I believe, as this Court described it in the Duffy tool case that we cite, we're looking at immediate action to stave off disaster. And I think the Board also properly looked at how the company behaved. Did their behavior match their claim? Yes, they should be applauded for being deliberate and for looking for alternatives to immediately cutting their workforce. But the fact they engaged in a deliberate process belies the claim there was absolutely no chance to bargain. Well, is there any indication in the record how long of a delay it would have caused the employer to engage in bargaining prior to making the decision to lay off the four technicians? Well, because they elected not to bargain at all, I can only guess how long bargaining would take. We'll never know because they didn't try, Your Honor. But it took months where the company realized times are bad, we might have to make cuts. And very deliberately announced to the team leaders, you might want to start thinking of whom you might cut. And then came back a month later, there's still a possibility of cuts. And then to their credit, they wanted to be deliberate. They created a new way of evaluating the techs, the technicians, a new form, and then decided who should be cut. But all of this belies the idea that however bad the economic circumstances were, that they had to act immediately and could not bargain. And I would respectfully submit the idea that bargaining wouldn't matter and it's wholly improbable that this could have changed anything. It's just speculation. We'll never know because they didn't try. Who do you bargain with? Excuse me, Your Honor. When you say bargaining, because generally you've got people on each side and there's no certification of a union at this point. Well, under the at-peril doctrine that we've been discussing, they act at their peril in refusing to bargain with the union after the election. But who do you bargain with at the union? Is that all obvious? It's something I just don't understand. Oh, I think the record shows who the union officials were and the union officials had been in contact with the company to request bargaining. It was just a request. So those are the people you bargain with in anticipation of whatever they would be the people that would be bargaining for the union if the union is certified? Correct. And the union, I believe, announced who their representatives were. And the policy for that rule is well settled. It's that if you allow the company to assume they're going to win their election challenge and not bargain, you're boxing the union in. You're undermining the union by making changes. And then if the union certified two years later might not be able to catch up. And in the meantime, you've negated the employee's free choice of representative. But as the courts have pointed out in the cases we cite, there's nothing unfair about that doctrine. It's well settled. It balances the policies fairly. And frankly, the doctrine itself is not challenged here. My opponent claims there are exceptional circumstances justifying a departure from that doctrine. But as we explain in our brief, they don't persuasively make the case. Is the national company, is it AutoNation? Yes. And how many are there? My opposing counsel would be better equipped to answer that question. There's a lot. I mean, they're truly a national company. Are all of these at some stage of bargaining or union? Is this going on? I know we just had, as you know, a couple of weeks ago we had another case. I forget where it is, Alabama or someplace. Are there others around the country going on right now at some stage of bargaining? I do not know. I do not know the status of bargaining at other AutoNation locations that aren't particularly before the court. I'm sorry. But one thing not discussed is this notice that's supposed to go to all of them. As opposed to the ALJ just said it was for this company. Right. And that's why I was curious. I understand. Who all is. Well, as to the notice, I believe it's stipulated on the record that the overbroad policy in question, and there's no serious dispute here that it was overly broad, was posted or maintained at AutoNation locations nationally and therefore proportionate to that. The board said, well, you have to post a notice as to that unlawful rule at all locations nationally, at all locations where the rule was actually maintained, which is supported by settled precedent and fair and tailored to expunge the actual violations. Mr. Leroux. Does the record reflect with any specificity the extent of Mr. Roberts' involvement with the union? Well, yes. As we explain in our brief, the record describes Mr. Roberts' union activities in terms of attending meetings and other things like that, as well as the evidence showing, or at least supporting the reasonable inference that, the company and Mr. Berryhill were aware of those activities. As we explain, there's a couple of key factors there. One is that when Mr. Berryhill learned of the election, as directed by his senior management, systematically called every technician into his office to interrogate them about the union, which the board found was unlawful, and he chose to start with Mr. Roberts, which at least supports the reasonable inference that he had a reason for starting with Mr. Roberts, which was that he knew Mr. Roberts was a union advocate, which, as was discussed this morning, is also supported by Mr. Weiss' testimony, which was credited in that relevant part. Now, I understand my opponent attacks that credibility decision, and he acknowledges he has a very heavy burden to meet. He has to show that it was inherently incredible, patently unreasonable. Whatever standard you choose, it's a very high one. But here, the ALJ credited the portion of Mr. Weiss' testimony that was corroborated in part by Mr. Berryhill, who acknowledged, yes, Mr. Weiss was in my office frequently, talking about the union campaign, offering his help, discussing which individuals supported the union or perhaps didn't. And in those particular circumstances, it was not an abusive discretion or inherently incredible or illogical, as my opponent says, to credit Mr. Weiss on that one point, which further supports the finding of an unlawful discharge in knowledge of his activities. Mr. Loro, can I take you back to the April 2009 layoffs of four technicians? Yes, Your Honor. The administrative law judge said that these folks would have been laid off anyway, given the economic circumstances and that the decision was not based on the anti-union animus. What would have been the point in light of those findings in bargaining? Well, Your Honor, the ALJ, you are correct, did say that the decision to lay off four employees at that time was not based in a discriminatory or anti-union motive. I don't know that he specifically said these particular four employees would have been laid off anyway. But some four. Yes, some four. The point of bargaining, and again, we'll never know how successful it would have been. We can only speculate because the company chose to cut off the process before it started, is that these kinds of concerns, whether it's operating costs, labor costs, wages, hours, they are amenable to bargaining, and there's the potential the union could make concessions that would help the company seek what it claims it wanted, some solution short of laying off employees or that many employees. But again, we'll never know because the company decided not to do it. Affects bargaining, is that a relevant concern here? It can be, and I want to be clear. I think my opponent may have suggested, but I apologize if I misheard, that this was really only about effects bargaining, but the board is very clear. Well, it's all hypothetical anyway. Yes. But I'm trying to understand. Right. I appreciate your point about alternative cost-cutting measures that would save the jobs, but even if the jobs were not to be saved, there might also be ways to mitigate their effects on those individuals. That's right. As you mentioned, it could be severance packages, other assistance, and the board made clear that the duty to bargain was over both the decision and its effects. Does the record here give us any indications about how much was actually saved by these layoffs, particularly given the piecework method of paying technicians? I don't think it does, Your Honor, and I believe opposing counsel mentioned this morning that this wasn't about laying off employees to save money, per se, because of the flat rate way they were paid. They were only paid for the work they did. They were not costing money just by sitting there doing nothing. And my opponent explained, well, we had too many technicians. We wanted to preserve the work for the workers. You're also in an economic crisis for them, too. Right. We wanted to preserve work, this is their claim, for the ones they thought were the best workers. They just didn't have enough hours to go around. Well, they were very worried about their best people finding work elsewhere. And that's understandable, Your Honor. But the standard is, was it a compelling need to take action? Was immediate action required? And as the judge reasonably found, there was no evidence that these purported losses of personnel were imminent. It's a noble idea to preserve people, but there's no record evidence showing if we didn't act now, we would have lost these people. Or more to the point, if we waited a little bit to bargain with the union, we would have lost these people. There's no record evidence showing that, which means the company did not meet its burden of proving compelling economic circumstances or economic exigency. Of course, if they didn't lay somebody off, there's another thing that just sort of trickled through here, is there could be a favoritism issue. And when only so much work comes in the door, and it's not enough to keep everybody busy, somebody could funnel the work toward the best people they want to keep while the others remain idle. I mean, that's not even brought up, but if we're talking about layoffs for that purpose, the alternative would be to have people stay there and not enough work comes in for them to do anything. I don't know that, that's not really argued, but it does seem to be at least logical that you lay off the people that were the amount of work, based on the amount of work, and would keep the best people there who might otherwise find work elsewhere. Although in these times, because it does seem to me it was a pretty challenging time for the auto industry to find another job somewhere else. It was a challenging time, but the issue here is the company failed to prove it had to act immediately and could not possibly honor its duty to bargain. They'll argue they waited a year. Excuse me, Your Honor? It took over a year to accumulate the immediacy, I guess. And I think that cuts both ways and supports the Board's finding that if it took a year and it was a deliberate process, why is it you couldn't bargain at any point during that process, when you were aware of those ongoing months of the potential need to make labor cuts? Why couldn't you speak with the labor representative? And although perhaps the evidence could be viewed two ways, the way the Board viewed it is at least permissible and therefore should be accepted by the Court. You know, there's one issue that nobody's talked about, and that's at that, what's his name, Castellano? Catalano, yes, sir. Catalano, yeah. And they had a guest come in, somebody from the Health Department or whatever, and he was concerned about people not washing their hands after using the bathroom, and she comes in and talks about something else, and then he said sort of innocuous comments about criticizing her, and then he got, what do they call it, talked to, it's not, what's the word? Documented coaching, I think. Coaching, coaching, yeah. He got coached. I didn't see that as such a big deal. Well. Because there were a lot of pages devoted to that. As to whether the coaching itself was a big deal? Not ridiculous, just that it's, that it was something, it was a violation of some kind. Well, the issue is that it is a disciplinary action, coaching him in that way and a written coaching at that, taken against him because of his protected concerted activities, which, as you noted, went towards furthering his coworkers and his concerns over workplace hygiene. And when he took actions in that regard, he was punished for it, even though, as we show in our brief, he didn't act in a manner that exceeded the act's protections. I mean, I think, as you suggested, his comments to the speaker weren't the worst things in the world, but even if he felt they were a little intemperate or rude, solid law shows that employees do not forfeit their rights merely because their comments are intemperate or rude. But as we explain in a brief, that documented coaching did qualify as disciplinary because it could have the effect of inhibiting a reasonable employee engaging in such activities again for fear of getting another coaching or fixing further disciplinary action. Would undocumented coaching have posed the same problem? Potentially. I mean, I think we'd have to look at the facts over whether it was a disciplinary action. It depends on how the employer does things. Sometimes being sat down in a supervisor's office and being given a stern warning not to do this again and that doing it again will have more serious consequences can result in a disciplinary action. I think we can see that. What was the timing of that incident? Can you remind me? The timing of Mr. Catalano's incident, I believe, was a little later, I think in September of 2009. Okay. So it's after we've got this record built up of the election violations and so on. Yes. Okay. But I'm happy to answer any other questions the Court has. But in the meantime, just to tick off a few things, and I think we discussed this, I just wanted to be clear that the duty here in terms of bargaining was over both the layoff decision and the effects. And I do believe that the deliberate nature in which the company acted in selecting employees for layoffs, while admirable in its own right, also belies the idea that they had to act immediately without even discussing it with the union. And again, as we've discussed, the duty to bargain was triggered on the date of the election won by the union, not the later certification date. Well, to sort of follow up on that, Ben, is that my earlier question is that AutoNation is big, got a lot of them going on. I don't know whether you even know how many. This is starting back, going all the way back to 2008. We're a lot of years later, and I just wondered if a whole lot more of this has gone on at various stages around the country, or these two that I'm familiar with are the only ones that you're familiar with. I guess you would be dealing with all of them if there were more of them. Well, off the top of my head, I'm only aware of the two cases you mentioned. And to be frank, as an appellate attorney for the Board, I tend to be focused on the cases that make it to you and that I present to you. So we haven't had any others that are this far yet, I guess. None that I'm aware of. And it's likely I'd know. I just don't want to mislead you. I can't be sure about every other possible case against the company. I think my opposing counsel may know if there are other charges at other AutoNation facilities, but I do not know off the top of my head. Unless the Court has further questions, I thank you for the time. Thank you so very much, Mr. Laurel. Thank you. Mr. Bernstein, I did say I would give you another minute. Thank you, Your Honor. A couple of quick points that came up just now I wanted to address. Specifically, it's a subtle point but an important one. My opponent starts out by referring to the foreseeability standard as if that standard actually governs these proceedings, and we submit it does not. Foreseeability is, at best, one of many factors that the NLRB has taken into account. It doesn't govern the standard by which our conduct should be viewed here. In fact, the NLRB itself all but abrogated that standard in connection with a case called Van Dorn II, which came back on remand from the Sixth Circuit. Now, to be fair, my opponent does at that point, I heard him refer to compelling economic necessity. And there I would submit that if the facts before the court and in the record don't establish a compelling set of circumstances, we're hard-pressed to understand what would. And would further assert that the circumstances in this case would appear to be, in many cases, more compelling than those that were before this court in Sunstrand, where the employer was certainly confronted with a serious event, but one which, if you look at the lower record, was confined to the cancellation of the largest customer order. I would also point out that what has never come forward, to my knowledge, from the NLRB is any evidence that pro forma bargaining during this period in question would have effectuated or brought about a different result. And that's really at the heart of one of our chief arguments, because I just want to remind the court that we're up against a back pay remedy going back seven years. And in our view, that remedy could be deemed nothing other than punitive, which is not necessarily a proper remedy imposed by this agency for what amounts to a refusal to bargain, as opposed to a discriminatory act. But do you think the board should be required, or the union should be required to prove what the results of the bargaining would have been? Under the guise of Sunstrand, I suppose we would submit that in a vacuum. In essence, all we're left with is record evidence bereft of any indication that bargaining would have effectuated any change in the outcome in terms of the four who were selected. And therefore, a remedy of back pay essentially amounts to double payment, i.e. paying four hundred. But you don't think that there should be a burden of proving what the outcome of bargaining would have been? I would suggest there should be. How on earth, if you violated the law by refusing to bargain, how on earth is the injured party supposed to prove what the final result of that would have been? Well, I suppose one example would be to proffer evidence as to what the union would have pursued had they requested bargaining through the representatives who, in this case, they say were not contacted. The record shows, however, that in this case, the union didn't even request bargaining until after the layoffs were implemented, if memory serves. And in that bargaining request said nothing about the layoffs themselves. Thank you so very much, Mr. Bernstein. Thank you, Mr. Laurel. The case will be taken under advisement. Thank you.